IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

**HELEN L. HALL**,

     Plaintiff,

     v.

**MICHAEL J. ASTRUE**, **Commissioner
of Social Security,**

     Defendant.

Case No. CV 10-512-SI

**OPINION AND ORDER**

Martin R. Cohen
P.O. Box 1229
Lake Oswego, OR 97305
Linda Ziskin
P.O. Box 2237
Lake Oswego, Oregon 97035
     Attorneys for Plaintiff

Dwight Holton
United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
Brett E. Eckelberg
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
     Attorneys for Defendant

Opinion and Order Page 1

**SIMON, District Judge:**

## I.  INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Helen Hall for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI"). Ms. Hall alleges disability on the basis of a seizure disorder and one or more mental illnesses. The Commissioner concluded that Ms. Hall's seizure disorder was a severe impairment but saw no objective evidence that any seizures were of a frequency or duration to be disabling. The Commissioner also concluded that Ms. Hall's mental illness was not severe, was in remission, or was under control with antidepressant medication. Thus, the Commissioner found Ms. Hall not disabled.

Ms. Hall challenges the Commissioner's findings at steps two and five, on the grounds that (1) the step two findings were incomplete; (2) the Commissioner erred in accepting the opinions of a testifying medical expert; and (3) the conclusion at step five that Ms. Hall was capable of performing work that exists in the national economy was erroneous because some of her limitations were not considered. For the reasons that follow, the Commissioner's decision is affirmed.

## II.  BACKGROUND

Ms. Hall filed an application for benefits on April 11, 2005, in which she alleged an onset date of November 1, 1998. The application was denied both initially and on reconsideration. Ms. Hall requested a hearing, which was held on March 18, 2008, before Administrative Law Judge ("ALJ") Linda R. Haack. At the hearing, Ms. Hall amended her alleged onset date to

Opinion and Order Page 2

February 21, 2004. On May 20, 2008, the ALJ issued the decision finding Ms. Hall not disabled. When the Appeals Council denied review, the ALJ's decision became the Commissioner's final decision.

Ms. Hall was born in 1968 and was 40 years old at the time of the ALJ's decision. She has a high school education. Her past relevant work was as a retail sales clerk manager. Ms. Hall has not engaged in substantial gainful activity since her amended alleged onset date. Her date last insured is December 31, 2004.[1]

## A.    Medical Evidence

The Court has separated its discussion of Ms. Hall's seizure disorder from her alleged mental illness, although the record makes it somewhat difficult to distinguish between them. The medical evidence indicates that Ms. Hall has had one seizure that involved loss of consciousness, in December 2006. She has also, however, reported symptoms, including blackouts and "spells" that involved tingling, a feeling of heaviness in her head, difficulty talking, blurred vision, hearing "words in a jumbled way," and being unable to talk, that some practitioners, including psychiatrists Angela Andrich and Nancy Cloak, have attributed to psychomotor seizures. Ms. Hall herself has referred to "major" and "minor" seizures involving these symptoms, with the difference between the two seeming to be a matter of duration. Tr. 390.

### 1.    Seizures

---

[1] DIB benefits require at least 20 quarters of coverage within the 40-quarter period that ends with the quarter in which the disability occurred. The end of a claimant's insured status is frequently referred to as the "date last insured." In a DIB case, the claimant must prove that the current disability began on or before the date last insured. *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). Proving disability before the date last insured is not necessary for receipt of SSI benefits.

Ms. Hall's seizure disorder was diagnosed on the basis of electroencephalograms ("EEGs") on June 27, 2002 and May 25, 2004. Tr. 232, 227.

On May 29, 2003, Ms. Hall consulted neurologist Stephen Gancher, M.D. Tr. 216. Ms. Hall said she had been having episodes for the past 10 or 15 years, increasing in frequency and currently occurring between one and 20 times per day, for the past five years. Tr. 216. The episodes started with a "feeling of tingling in the limbs that ascends." *Id.* She felt weak and, if standing, had to sit down. *Id.* If she was listening to anything, such as speech or music, the sounds became jumbled. *Id.* She said each episode seemed to last two or three minutes, but that she had "watched a videotape" and realized that the episodes actually lasted almost an hour. *Id.* If she was involved in a conversation at the time of the episode, she would put her fingers to her lips, gesturing for others to stop talking, wave her hands, put her head down, and wait for the episode to pass. *Id.* Dr. Gancher wrote, "She apparently does not speak or exhibit any automatisms during these episodes." *Id.* Dr. Gancher prescribed the anticonvulsant medication Dilantin. Tr. 217.

On February 5, 2004, Dr. Gancher noted that Ms. Hall had begun taking Lamictal. Tr. 208. Ms. Hall reported that she continued to have episodes in which she felt tingling in her head and weakness in her neck or throughout her body, hearing only a "jumbled mess" when being spoken to. Tr. 206. Ms. Hall said if she ignored the episode and tried to "proceed on," she became nauseated. *Id.* The episodes lasted one to five minutes, occurring up to a dozen times a day on a nearly daily basis. *Id.* She stopped taking Lamictal, however, after developing a rash on her fingers. *Id.* Dr. Gancher noted that Ms. Hall's "episodes have now not responded to two different anticonvulsants, Dilantin and Lamictal, at a dose that should have worked." *Id.*

Opinion and Order Page 4

Dr. Gancher prescribed Keppra, but noted that if that failed to work, "the diagnosis of seizures does have to be called into close question." *Id.*

On April 15, 2004, Dr. Gancher wrote in a progress note that Ms. Hall's spells continued and that she had stopped taking Keppra because it made her dizzy. Tr. 203. Dr. Gancher wrote, "I am still a little uncertain about the diagnosis [of seizures], and wonder if these could be some psychiatric condition rather than seizures. I did suggest that she try one other anticonvulsant and Trileptal was selected. . . . [I]f Trileptal is not benefiting her, this medicine should be discontinued and other alternatives considered." *Id.* On May 25, 2004, however, Ms. Hall's EEG was abnormal, demonstrating an irritative focus in the left temporal lobe, compatible with a diagnosis of a seizure disorder.  Tr. 227.

On December 9, 2006, Ms. Hall was admitted to the Emergency Department of Providence Milwaukie Hospital after reporting a seizure involving brief loss of consciousness and incontinence. Tr. 340. Ms. Hall reported at the time of admission that she had had seizures in the past, but "that she has never been on medications." *Id.*

On December 19, 2006, Ms. Hall saw neurologist Michael Sluss, M.D. Tr. 394. Dr. Sluss ordered a sleep-deprived EEG. Tr. 395. The EEG revealed abnormal awake and drowsy results, including frequent left anterior mid-temporal sharp wave activity "strongly suggestive of an underlying left temporal seizure focus." Tr. 393. Dr. Sluss could not rule out a "more generalized seizure tendency." *Id.* He concluded that Ms. Hall's reports of an abnormal feeling through her legs during which her "comprehension [was] jumbled" were psychomotor seizures. Tr. 392. Dr. Sluss strongly recommended Dilantin, and Ms. Hall agreed to take it. *Id.*

///

Opinion and Order Page 5

On February 6, 2007, Dr. Sluss wrote that Ms. Hall said she had had no further seizures. Tr. 391. Ms. Hall, however, complained of feeling dizzy and slowed down, which Dr. Sluss attributed to the Dilantin. *Id.* On February 20, 2007, Ms. Hall reported still having up to three minor seizures per day, but no more major seizures. Tr. 390. She described the minor seizures as "'head down' for three minutes while her head 'is racing' and she 'can't move.'" *Id.* Dr. Sluss wrote that he was considering increasing the Dilantin dosage or starting her on an additional anticonvulsant medication. *Id.*

An MRI of Ms. Hall's head on March 7, 2007 showed no evidence of cortical dysplasia or migrational abnormality. Tr. 396. On March 20, 2007, Ms. Hall reported one to three partial seizures per day, with frequency "sometimes being inversely correlated with her marijuana use." Tr. 389. Dr. Sluss added Keppra. *Id.*

On April 17, 2007, Dr. Sluss wrote that the addition of Keppra had helped reduce her seizures, "but at the cost of substantially increased personal irritability," so he was tapering her off Keppra and starting her back on Lamictal. Tr. 388. Dr. Sluss recommended that she return in a month. *Id.* There are no further progress notes from Dr. Gancher or Dr. Sluss in the record.

On April 27, 2007, Ms. Hall was admitted to Willamette Falls Hospital in Oregon City after her boyfriend reported that she had had "two seizures today." Tr. 400. He said the seizures involved "shaking" that started in her feet and "moved up." *Id.* Ms. Hall reported that she recently changed her medication from Lamictal to Dilantin. Tr. 397. No seizure activity was observed at the hospital, tr. 398, and a blood draw revealed a sub-therapeutic level of Dilantin. Tr. 398, 400.

///

Robert McDevitt, M.D., called as a medical expert at the hearing, noted that Ms. Hall had had only one major motor seizure, in December 2006, and that with medication Ms. Hall could engage in simple repetitive activity, but not in any kind of hazardous or dangerous work. Tr. 497.

### 2.    Mental illness

Ms. Hall was treated at Kaiser Permanente between February 2001 and January 2005. According to a chart note dated February 1, 2001,  written by Lillie Spence, Ms. Hall described intermittent episodes during which she saw blurred shapes and felt disoriented, although the episodes lasted only moments and she was able to drive or function through them.  Tr. 226. Ms. Spence wrote, "likely schizoaffective disorder symptoms." *Id.* The record does not reveal whether Ms. Spence is a licensed psychiatrist or psychologist.

On November 14, 2001, Mary Eschbach, whose credentials also do not appear in the record, listed Ms. Hall's diagnoses as Depression, Suicidal Ideation, and Schizoaffective Disorder. Tr. 225. Ms. Hall told Ms. Eschenbach she felt "depressed enough to take [an] overdose of psych meds," *id.,* but when she was seen on March 26, 2002, by licensed clinical social worker Barbara Gould, Ms. Hall was found to be "stabilizing in a positive direction" and looking for a job.  Tr. 224.  On July 22, 2003, Ms. Gould noted that Ms. Hall "continues to manage her ADLs [Activities of Daily Living] independently" and "remains stable on meds." Tr. 214. A chart note dated August 29, 2003 states that Ms. Hall's medications were "effective re: psychiatric disease," but that Lamictal had been substituted for Dilantin. Tr. 210-11.

Psychologist John Adler, Ph.D., evaluated Ms. Hall on June 27, 2002. Tr. 157-161. Ms. Hall said she was unable to think straight; heard voices telling her to do things she did not want to do; did things she could not recall, such as getting married; and had spells in which she

Opinion and Order Page 7

suddenly felt weak and stopped talking or responding for a few minutes at a time. Tr. 157. Ms. Hall said she had been diagnosed with Schizoaffective Disorder. *Id.* She was taking Paxil and Zyprexa and had been receiving monthly mental health counseling. Ms. Hall said she spent her days watching TV, doing dishes, cleaning, and playing on the computer. Tr. 159. She also went swimming and played pool three to four times a week, did laundry, and shopped with her husband. *Id.* She had regular contact with family members and friends. *Id.*

The results of Ms. Hall's mental status examination was essentially normal, except that during the interview, she suddenly put her head down, closed her eyes, and stopped speaking, responding to Dr. Adler's calling her name by holding up a finger to indicate that she needed more time. Apart from this incident, Ms. Hall's speech was normal and intelligible, and her mood showed no signs of major anxiety, anger or depression. *Id.* She was able to recall two of three unrelated items after two minutes and had accurate recall of what had been said and done up to 35 minutes earlier in the interview.  On a test of concentration and short term memory, however, she scored in the below average range. Tr. 160. Dr. Adler diagnosed Dissociative Disorder, Not Otherwise Specified ("NOS"), with a "rule out" diagnosis of Psychotic Disorder. [2] Tr. 161. He assessed her Global Assessment of Functioning ("GAF") at 47.[3]

---

[2] In the medical context, "rule out" means to "eliminate one diagnostic possibility from the list of causes of a patient's presenting signs and symptoms." *Taber's Cyclopedic Medical Dictionary* 2057 (Donald Venes, M.D. ed., 2009). Thus, a "rule out diagnosis" is a hypothesis rather than a conclusion.

[3] The GAF scale ranges from 1-100 and represents the examiner's assessment of psychological, social and occupational functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000) ("*DSM-IV-TR"*).  A GAF score of 47 represents "serious symptoms" or a "serious impairment in social, occupational, or school functioning." *Id.*

Psychiatrist Angela Andrich, M.D. evaluated Ms. Hall on October 3, 2003. Tr. 206-10. Dr. Andrich wrote that Ms. Hall had been "previously diagnosed with Schizoaffective Disorder, as well as a seizure disorder." Tr. 207. Ms. Hall said she had been "fairly stable" on a combination of Paxil and Zyprexa "ever since she was first treated after what she called a nervous breakdown about seven years ago." *Id.* Ms. Hall said that over the years, she had suffered primarily from depression, which caused her to sleep a lot, and that she had occasional thoughts of suicide with a desire to overdose on sleeping medication. *Id.* Ms. Hall said that she heard voices that coincided with personality changes. *Id.* The voices did not command her to harm herself or others, and medication modulated them. *Id.*

Dr. Andrich wrote that Ms. Hall "does give some history that is suggestive of a Dissociative Identity Disorder," but that "I would need to get more information on that." Tr. 208.  It was "definitely possible that her loss of time could be due to the fact that she is having seizures. It is interesting, though, that she refers to the voices as clearly distinct personalities and says that her behavior changes when a particular voice is talking to her." *Id.* Dr. Andrich assessed Ms. Hall's current GAF at 50-55, which indicated "moderate" symptoms.

On October 29, 2003, Ms. Hall was given a neuropsychological screening by psychologist Cheryl Brischetto, Ph.D. Tr. 164-176. Dr. Brischetto reviewed Ms. Hall's records, conducted a clinical interview, evaluated her mental status, and administered the following tests: memorization of 15 items; the Test of Memory Malingering ("TOMM"); the Wide Range Achievement Test (3rd Edition) ("WRAT-3") reading recognition; the Wechsler Adult Intelligence Scale III ("WAIS III"); the Wechsler Memory Scale III ("WMS III"); the Trail Making Test, Parts A and B; the Reitan-Indiana Aphasia Screening Examination; the Beck

Depression Inventory II ("BDI II"); the Beck Anxiety Inventory ("BAI"); and the Minnesota

Multiphasic Personality Inventory-2 ("MMPI-2"). Tr. 164.

Ms. Hall told Dr. Brischetto she had "blackouts" in which she lost track of time and

"spells" that involved tingling all over her body, heaviness in her head, and difficulty talking.

Tr. 166. She described the blackouts as occurring two to three times a week and the spells as

occurring 20-50 times a week. *Id.* Dr. Brischetto noted that Ms. Hall's reports about the onset

and duration of the spells were inconsistent with other self-reports in her medical records. *Id.*

Dr. Brischetto asked how she continued to drive and to keep her driver's license while

having blackouts and spells. Ms. Hall said she was "aware" of when they were going to occur

and pulled off the road. *Id.* Ms. Hall also told Dr. Brischetto that from the age of 10, she thought

she had "more friends in my head than other people" and that she was "part schizophrenic."

Tr. 168. She said she had been diagnosed with "a schizoaffective" by a social worker at Kaiser.

*Id.* Ms. Hall added that she also had multiple personalities. *Id.*

Although Ms. Hall's chief complaint was depression, which made her to want to sleep all

the time, she slept well and her weight was stable. Tr. 169. She was not having suicidal thoughts

and denied significant problems with tearfulness. *Id.* Ms. Hall said she had hallucinations when

she was "too nerved up," but then explained that they were not so much hallucinations as "more

people in my head taking over." *Id.* Ms. Hall described her day-to-day memory as "shot." *Id.* She

said, however, that she was "usually pretty good" with people. *Id.*

Dr. Brischetto wrote that she did not see enough in Ms. Hall's history or presentation to

indicate Schizoaffective Disorder. Tr. 175. Ms. Hall's description of various personalities "did

not clearly suggest current thought disorder," and her reporting on hallucinations was "not

consistent." *Id.* Dr. Brischetto did not think Ms. Hall's history or current symptoms supported a

diagnosis of schizophrenia. *Id.* Dr. Brischetto wrote, "Overall, this examiner frankly finds her

self-report of symptoms 'questionable.'" *Id.* Dr. Brischetto thought Ms. Hall's poor performance

on memory testing "raise[d] concerns about full effort," Tr. 171, but thought it might also

indicate side effects from medication. Ms. Hall's thinking seemed logical and organized, without

loose association or tangentiality. *Id.* There was no indication that Ms. Hall was responding to

internal distractors. *Id.* Dr. Brischetto noted that Ms. Hall did not appear to be in any emotional

distress. Dr. Brischetto noted: "In some ways her affect in the session seemed inconsistent with

what she described in clinical interview," as well as with "her self-report on the [BDI II] and the

[BAI]," on which she had indicated severe ranges of self-reported depressive symptoms and

anxiety. Tr. 173. Dr. Brischetto thought Ms. Hall's scores on the MMPI-2 "raised some

questions about the validity of the profile" and thought it possible that some scores could

represent "exaggeration of symptoms or a plea for attention." *Id.* She did not appear to be

psychotic in the interview and appeared capable of understanding information. *Id.*

Dr. Brischetto made provisional diagnoses of Mood Disorder Not Otherwise Specified

("NOS") and Dissociative Disorder NOS, with rule out diagnoses of Malingering and

Personality Disorder NOS with some histrionic features. Tr. 176. Dr. Brischetto completed a

form, titled "Medical Source Statement of Ability to Do Work-Related Activities (Mental),"

indicating that Ms. Hall had moderate limitations on her ability to understand, remember, and

carry out detailed instructions and on her ability to interact appropriately with the public,

supervisors, and co-workers.  Tr. 191-92. Dr. Brischetto commented,

> While she claims to get along well with people her dramatic style,
> admitted impulsivity, and affective presentation and "spells" [are]

> likely to impact how she appears to others. However, she has
> reportedly been a manager . . . for three years and has been in jobs
> working with others so that social contact is not precluded, but
> she'd be limited in a work setting.

Tr. 192.

Between February 2005 and May 2, 2006 Ms. Hall received social services and

medication management from Clackamas County Mental Health ("CCMH"). Tr. 278-338.

CCMH diagnosed Ms. Hall with Depressive Disorder NOS, tr. 332, and she was given a mental

status examination on February 11, 2005. Tr. 330. Ms. Hall stated that she heard six different

voices through the day and night. *Id.* She denied having delusions. *Id.* She also denied feeling

suicidal and said she had never attempted suicide. *Id.* Ms. Hall said she had periods when she

dropped her head for two to three minutes, sometimes up to 30 minutes, and heard words in a

jumbled way and had blurred vision. *Id.* The examiner noted, however, that she was able to track

during the interview, as well as to count backwards by threes from 85. *Id.*

A CCMH chart note dated June 20, 2005, reported that Ms. Hall said she was living in a

tent with her friend "Rob," who also went by the name "Ted." Tr. 297. Ms. Hall denied having

been diagnosed with a dissociative identity disorder, but she described several personalities. Tr.

298. Ms. Hall reported that these and other personalities "come out when they want to," and kept

her from working and keeping jobs. *Id.* Ms. Hall was diagnosed with Depressive Disorder NOS

and Dissociative Identity Disorder. Tr. 305. Throughout her treatment at CCMH, Ms. Hall

continued to report dissociative episodes, although practitioners consistently observed no

indication that she was responding to internal stimuli. Tr. 278, 279, 289, 292.

On October 10, 2005, Ms. Hall was evaluated by psychiatrist Nancy Cloak, M.D.

Tr. 241-46. Ms. Hall reported that since the age of 10, she had experienced auditory

Opinion and Order Page 12

hallucinations of voices, "parts of myself that do different things," and she said that she began

experiencing blackouts in her teens. Tr. 242. With respect to the auditory hallucinations, she

described them as also associated with the different parts of herself that took control of her

behavior and acted in ways uncharacteristic of her. *Id.*

Ms. Hall described a history of depression, but Dr. Cloak wrote that, as she reported it,

Ms. Hall's depression "mainly includes feeling suicidal when upset about life circumstances."

*Id.* She did not, in Dr. Cloak's opinion, "seem to have other depressive symptoms that lasted for

sufficient time to meet criteria for depression." *Id.* Ms. Hall said she felt anxiety in reaction to

loud voices or arguing, but did not have panic attacks. *Id.* Ms. Hall related that she had not been

psychiatrically hospitalized, and she had no history of harming herself. Tr. 243.

Ms. Hall had been living in a tent for approximately a year. Tr. 243. She said that on a

typical day, she listened to the radio and played solitaire, visited other campgrounds and friends,

read, or visited the skate park with her boyfriend. *Id.* She was independent with respect to meals,

finances, shopping, transportation by bus, and housework. *Id.* Support came from "her many

friends at the campground and her boyfriend." *Id.* Dr. Cloak observed that Ms. Hall had appeared

at the interview with "dirty hair in a bandana," body odor, dirty fingernails, and dirty clothes.

Tr. 244. Her speech was dramatic and expressive but not pressured. Thought processes were

tangential and occasionally irrelevant, but she did not exhibit loosening of associations. *Id.* There

was no evidence of delusions or intrusive thoughts. Tr. 245. She said she had continuous

auditory hallucinations, but did not appear to respond to any during the interview. Tr. 245.

There were no blank or incoherent spells during the interview. *Id.*

Dr. Cloak thought Ms. Hall's symptoms suggested either Dissociative Disorder NOS or

complex partial seizure disorder and alcohol or cannabis abuse. Dr. Cloak diagnosed Borderline Personality Disorder as well. *Id.* Dr. Cloak considered Ms. Hall able to understand and remember instructions and sustain concentration and attention in the short term. *Id.* Ms. Hall was appropriate socially within the interview in general, although "overall somewhat dramatic," but she had a "history of being socially inappropriate and undependable." *Id.* Dr. Cloak thought barriers to Ms. Hall's effective job performance would "primarily be interpersonal in terms of her history of temper and lashing out as well as leaving situations abruptly." *Id.* Dr. Cloak wrote, "If she is indeed having seizure-related blank spells up to 20 times per day, this would significantly interfere with productivity and could be dangerous." *Id.* Dr. Cloak noted that while Ms. Hall was receiving mental health treatment, her blank spells had not been fully evaluated or treated, by her report. *Id.*

On November 30, 2005, reviewing psychologist Robert Henry, Ph.D. completed a Mental RFC Assessment, finding that Ms. Hall had a personality disorder and substance addiction disorders. Tr. 247. In his opinion, she had mild restrictions in ADL, moderate difficulty in maintaining concentration, persistence or pace, understanding, remembering and carrying out detailed instructions, and moderate limitations on her ability to interact appropriately with the general public. Tr. 261-62.

On January 28, 2006, Ms. Hall was examined by John Ellison, M.D., an internist. Tr. 265-68. Ms. Hall told Dr. Ellison that for the moment, her other personalities "seemed to be inactivated." Tr. 265. Mental status examination revealed that while Ms. Hall was able to repeat a string of five digits accurately, she was able to memorize only one of three unrelated words and repeat them five minutes later. Tr. 267. Her long-term memory was unimpaired: she was able to

Opinion and Order Page 14

name the candidates in the last presidential election and the last four presidents. *Id.* She could not, however, count backwards from 100 by sevens, and had difficulty with other calculations. *Id.* After physical examination, Dr. Ellison concluded that Ms. Hall was able to stand and walk only about 30 minutes at a time because her legs got "weak and tired," possibly the result of undernutrition; he also found that she was able to lift and carry only about 20 pounds occasionally. Tr. 267. Her ability to sit and to handle objects were unlimited. *Id.*

On October 13, 2007, Ms. Hall was admitted to St. Vincent's Medical Center in Bridgeport, Connecticut, after being found unresponsive in her mother's home. Tr. 404. Ms. Hall admitted taking 90 Zyprexa tablets and an undisclosed amount of Lexapro. *Id.* Although she had left a suicide note, Ms. Hall denied that she wanted to die. *Id.*[4] Upon admission, Ms. Hall was lethargic, made poor eye contact, and appeared to be depressed. Tr. 405. She was cognitively intact. *Id.* She reported diagnoses in the past of schizoaffective disorder and possible dissociative disorder, as well as a long history of seizure disorder. *Id.* Ms. Hall was admitted to the hospital for four days, then transferred to Hall-Brooke Behavioral Health Services. Tr. 432. Ms. Hall was discharged from Hall-Brooke on October 25, 2007. Tr. 446.  Upon discharge, Ms. Hall was denying current suicidal ideation, depressed mood, or auditory hallucinations. Tr. 446-47. She was calm, cooperative, well related and well groomed, and her speech was clear, coherent, and not pressured. Tr. 447. Although Ms. Hall reported "a history of dissociative identity disorder, which she states was diagnosed 10 years ago," she explained that she had been "free of all these episodes for the past 7 years." *Id.*

---

[4] Ms. Hall reported a previous psychiatric hospitalization to a Kaiser hospital in Oregon in 2000, but the record does not contain any evidence related to this admission.

**B.** **Hearing Testimony**

At the hearing the ALJ asked Ms. Hall to explain what impairments prevented her from working. Ms. Hall responded that she had a very short memory and had "problems walking around or staying standing for long periods of time."  Tr. 474. She said that she was using a cane because her hips hurt. Tr. 475. She added that she was able to stand for 15 to 20 minutes "if I push it" and could sit "at least four hours." *Id.* She explained that she could walk about five blocks, but would have to "rest in between." *Id.* Ms. Hall added that she could lift about 25 pounds. Tr. 476. She said she got along with people "all right" and could understand and follow instructions if they were "repeated a few times." Tr. 476. Asked whether she could "keep your mind on what you're doing," Ms. Hall answered, "usually not." Tr. 476.

Ms. Hall said she "love[d] looking up things" on the internet and doing library research. Tr. 479-80.  She said she also "love[d] chat rooms," saying they were "one of my addictions," and that each day, she spent "at least three to four hours or more" in them. Tr. 480-81. Ms. Hall was writing her autobiography and also enjoyed knitting and playing with her cat. *Id.* She spent one or two hours a day playing solitaire. Tr. 481. The ALJ asked Ms. Hall, "Mentally why do you think you can't work?" Tr. 482. Ms. Hall answered, "I can't think straight and, yes, I get easily sidetracked. . . . Also, if somebody teaches me something, usually within a week or so I'll walk in and be completely blank of what I have to do." *Id.* Ms. Hall acknowledged that she was "still smoking marijuana." *Id.* Ms. Hall said she had been in special education classes since second grade and that even when she was working as a manager, she had difficulty thinking straight and getting things done, because "tasks can be very difficult for me." Tr. 483.

///

Opinion and Order Page 16

Ms. Hall explained that the "crew" in her head was "actually gone due to me trying to commit suicide." Tr. 484. She said, "I woke up in St. Vincent's Hospital in Bridgeport, Connecticut in ICU, and I didn't hear a peep except for my self-conscious, which scared me for a minute. I kind of miss them from time to time, but they aren't–they're not there any more." Tr. 484.

Ms. Hall said her most recent seizure had been in February 2008, the month before the hearing. Tr. 485-86. Ms. Hall described that seizure as "very light," saying "it took about five minutes if that." Tr. 486. During that seizure she "wasn't able to hear everything," and felt as though she had "at least five pounds on my head, I can't lift it. I try to talk, and anybody [sic] tells me that I'm talking gibberish. They can't understand me." Ms. Hall said after one of these episodes, she was "very dazed and confused" for at least "a good hour or so." *Id.*

Ms. Hall added that she gets depressed at least once a week. Tr. 487. Ms. Hall also said that "at least maybe 14 days or more [each month] . . . I'm out and about out of the household area," seeing doctors, visiting friends, going on walks and grocery shopping. Tr. 488-899. When Ms. Hall's attorney asked her to clarify her statement that she could lift and carry about 25 pounds, she said she could do so only "three to four times a day if that," and that she could lift and carry no more than five to 10 pounds frequently. Tr. 491.

The ALJ called a medical expert, psychiatrist Robert McDevitt, M.D. *Id.* Dr. McDevitt concluded, after reviewing Ms. Hall's records, that Ms. Hall "may" have a diagnosis of Schizoaffective Disorder "or even what they now call Dissociative Personality Disorder, which she now tells us has gone into remission following this massive overdose of the Zyprexa." Tr. 496. Dr. McDevitt thought Dr. Ellison's mental status examination established that

Opinion and Order Page 17

Ms. Hall's concentration, persistence and pace were unimpaired. *Id.* Dr. McDevitt did not think that there was "good evidence of a severe psychiatric impairment." *Id.* Dr. McDevitt concluded that "[w]hatever illness she has seems to be in remission with a relatively modest amount of medication" and that from a "strictly psychiatric standpoint," she was not experiencing any limitations on her capacity to function. *Id.* Upon further questioning by Ms. Hall's counsel, Dr. McDevitt testified that if Ms. Hall had a diagnosis of Schizoaffective Disorder, it seemed to be "in remission with a relatively modest dose of medication." Tr. 500. Dr. McDevitt did not see "any problems in her ADL activity," and her "social activity appears to be relatively good," including maintaining a relationship with her boyfriend over the past three and a half to five years and being in a long marriage before that. *Id.,* tr. 502. With respect to concentration, persistence, and pace, Dr. McDevitt considered her ability to stay in a chat room for four hours as evidence of "being able to at least concentrate on one activity for quite a period of time," and cited Dr. Ellison's mental status examination, which showed "fairly good concentration." Tr. 501. When asked about a diagnosis of Borderline Personality Disorder, Dr. McDevitt testified that he found it "difficult to understand," in view of Ms. Hall's ability to sustain long-term relationships and the absence of clinical evidence suggesting difficulty in engaging and working with other people. Tr. 503. Dr. McDevitt acknowledged that "being a bit unstable is certainly part of the history," but that Ms. Hall's instability appeared not to be "to the level that she shouldn't be able to function on a regular basis at a simple activity." Tr. 504. Dr. McDevitt agreed, however, that "her personality might interfere with effective interpersonal relationships at work." *Id.*

The ALJ called a vocational expert ("VE"), Gary Jesky. Tr. 505. The ALJ asked

Mr. Jesky to consider a hypothetical individual of Ms. Hall's age, education and past work experience who was able to sit eight hours with normal breaks; stand and walk four hours in an eight-hour day, 30 minutes at a time; lift 20 pounds occasionally, during up to one-third of the workday, and 10 pounds frequently, during up to two-thirds of the workday; able to communicate on a simple, but not an abstract basis; required to avoid hazards, unprotected heights, and driving; and limited to simple, repetitive tasks.  Tr. 508.

The VE responded that Ms. Hall's past relevant work would be ruled out because of the limitation on standing and walking, and that Ms. Hall would require sedentary work. *Id.* In his opinion, an individual with the limitations identified by the ALJ could work in occupations the VE identified from the Dictionary of Occupational Titles ("DOT"): cashier, DOT 211.462-010; small product assembler, such as DOT 713.687-026 (lens inserter); and packing and sorting jobs, with a representative DOT of 731.685-014.[5] Tr. 509. All of these jobs were unskilled. *Id.* The VE confirmed that all of the sedentary jobs identified could be performed by an individual who was changing position, "perhaps standing as much as four hours." Tr. 510.

---

[5] DOT is a publication of the United States Department of Labor that gives detailed requirements for a variety of jobs.  The Social Security Administration has taken administrative notice of the DOT.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 n. 8 (9th Cir. 2007). *See* United States Department of Labor, DOT (4th ed. 1991), available at http://www.occupationalinfo.org. The Social Security Administration relies "primarily on the DOT" for "information about the requirements of work in the national economy" at steps four and five of the sequential evaluation process.  SSR 00-4P, 2000 WL 1898704 *2 (Use of vocational experts and occupational information in disability decisions).  For purposes of determining whether a claimant can perform gainful activity, the Commissioner may rely on the general job characteristics of the DOT as presumptively applicable to the claimant's prior work, but the claimant may overcome the presumption that the entry for a given job title applies to her by demonstrating that the duties in her particular line of work were not as described.  *See, e.g., Villa v. Heckler*, 797 F.2d 794 (9th Cir. 1986).

**C.    The Sequential Evaluation**

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner proceeds to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments
> which significantly limits your physical or mental ability to do
> basic work activities, we will find that you do not have a severe
> impairment and are, therefore, not disabled. We will not consider
> your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step, where the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or equals one or more of the listed impairments, the claimant is considered disabled without consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity ("RFC") to do other work in consideration of the claimant's age,

education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**D.     The ALJ's Decision**

At step two of the sequential analysis, the ALJ found that Ms. Hall's only severe impairment was a seizure disorder. Tr. 16. The ALJ did not find Schizoaffective Disorder to constitute a severe impairment for Ms. Hall, on the basis of Dr. Brischetto's report questioning such a diagnosis because there did not appear to be a history or current symptomology to support a diagnosis of either schizophrenia or Schizoaffective Disorder, and on the basis of Dr. McDevitt's testimony. The ALJ found that Schizoaffective Disorder, Borderline Personality Disorder, possible Dissociative Identity Disorder, and substance abuse,[6] considered singly and in combination, did not cause more than minimal limitations on Ms. Hall's ability to perform basic mental work activities. The ALJ based this finding on Ms. Hall's mild limitations in ADLs (she is able to perform self-care activities, use public transportation, shop, perform household chores, and drive); social functioning (she has relationships with friends, a history of a stable marriage and long-term relationship); concentration, persistence or pace (she has average intellectual functioning, no evidence of significant limitations on ability to attend, concentrate, remember, or persist in a task, and generally adequate performance on mental status testing); and no episodes

_____

[6] The record contains numerous references to Ms. Hall's use of marijuana. See, e.g., tr. 168 (statement to Dr. Brischetto on October 29, 2003, that she had some marijuana in January 2003, but "it was so bad I decided I would never do it again"); tr. 207 (statement on October 3, 2003 to Dr. Andrich that she had not smoked marijuana for five months, but prior to that she smoked it occasionally); tr. 243 (statement to Dr. Cloak on October 10, 2005 that she had most recently smoked marijuana the previous week because it "keeps the voices quiet"); tr. 266 (chart note from Dr. Ellison dated January 28, 2006 documenting use of "marijuana regularly"); tr. 389 (note dated March 20, 2007 from Dr. Sluss that the frequency of Ms. Hall's seizures was sometimes "inversely correlated with her marijuana use").

of decompensation. Tr. 19.

The ALJ gave significant weight to the opinions of Dr. McDevitt, particularly his testimony that: (1) Ms. Hall had not demonstrated continuous psychotic behavior that would support a diagnosis of Schizoaffective Disorder; (2) the record contained no objective evidence to support a diagnosis of Depressive Disorder; (3) Ms. Hall's ability to participate in internet chat rooms for up to four hours suggested an ability to concentrate for substantial periods of time; (4) Ms. Hall's ability to maintain constant relationships and her ability to leave home regularly did not indicate problems in maintaining employment because of personality issues; and (5) functional limitations resulting from mental impairments would not preclude functioning regularly at a simple level. *Id.* The ALJ also cited to Ms. Hall's testimony that the multiple personalities had been in remission since October 14, 2007, and to the opinion of Dr. Brischetto suggesting an exaggeration of symptoms. *Id.*

The ALJ found that although the record documented evidence of seizure activity, there was no objective evidence supporting Ms. Hall's allegations that her seizures were of a frequency or duration to be disabling. Tr. 22. The ALJ cited to inconsistent information provided by Ms. Hall about the onset, duration, frequency, and symptomology of the seizures. *Id.* The ALJ also cited to medical reports showing that Dilantin had helped reduce the seizures, and that when Ms. Hall was hospitalized for a seizure involving brief loss of consciousness on April 27, 2007, laboratory testing revealed a sub-therapeutic level of Dilantin. *Id.*

The ALJ found "generally credible" the written testimony submitted May 14, 2005, by Ms. Hall's boyfriend, Roy T. Harrison, to the extent that he reported his observations. The ALJ discounted Mr. Harrison's report that Ms. Hall experienced blackouts because that statement was

not accompanied by a description of the frequency or duration of such occurrences. The ALJ

found Mr. Harrison's report that Ms. Hall had significant difficulty in the areas of memory and

getting along with others not supported by other evidence, including the testimony of

Dr. McDevitt.  Tr. 23. Other limitations Mr. Harrison had reported were "generally

accommodated in the [RFC]."  *Id.*

At step four, the ALJ found that Ms. Hall had the RFC to read, write, add and subtract

simple numbers; perform simple, repetitive tasks; work fulltime at a sedentary exertion level;

stand or walk four hours in an eight-hour workday for 30 minutes at a time; lift 20 pounds

occasionally and 10 pounds frequently; and communicate on a simple, but not abstract basis.

Tr. 20-21. These limitations precluded her from returning to her past relevant work. Tr. 24. The

ALJ, however, accepted the testimony of the VE and concluded that Ms. Hall retained the RFC

to perform the types of sedentary jobs identified in VE's testimony. Tr. 25.

### III.  STANDARD OF REVIEW

The Court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record.  *Meanel v. Apfel*,

172 F.3d 1111, 1113 (9th Cir. 1999). In determining whether the Commissioner's findings are

supported by substantial evidence, the Court must review the administrative record as a whole,

weighing both the evidence that supports and the evidence that detracts from the Commissioner's

conclusion. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision

must be upheld even if  "the evidence is susceptible to more than one rational interpretation."

*Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The initial burden of proving disability rests on the claimant.  *Meanel*, 172 F.3d at 1113.

To meet this burden, the claimant must demonstrate an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

. . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"

42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an

impairment must be medically determinable before it is considered disabling.

## IV.  DISCUSSION

Ms. Hall asserts that the ALJ erred by: (1) making incomplete findings at step two,

specifically by failing to make findings on Schizoaffective Disorder, Dissociative Identity

Disorder, and Borderline Personality Disorder; (2) improperly rejecting the opinions of treating

and examining physicians in favor of the opinions of Dr. McDevitt, a non-examining medical

expert; and (3) failing to incorporate all limitations in her RFC assessment, resulting in an

incomplete hypothetical to the VE.

## A.    Incomplete step two findings

Ms. Hall asserts that the ALJ erred by failing to address the severity of the Borderline

Personality Disorder diagnosed by Dr. Cloak, the Dissociative Disorder diagnosed by Dr. Adler,

and the diagnosis of Schizoaffective Disorder by three separate treating sources.

Addressing Ms. Hall's third point first, I find no support in the record for Ms. Hall's

assertion that she was diagnosed with Schizoaffective Disorder by three treating sources.  The

first reference in the medical record to Schizoaffective Disorder is a notation of "likely

schizoaffective symptoms" in chart notes generated by Ms. Spence, whose acceptability as a

Opinion and Order Page 24

medical source under Social Security regulations, 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d), is

not established in the record. Ms. Hall testified that she had been diagnosed with Schizoaffective

Disorder by a social worker at Kaiser. Tr. 168. Social workers are not considered acceptable

medical sources. *See, e.g., Turner v. Comm'r,* 613 F.3d 1217, 1223-24 (9th Cir. 2010) (social

worker not considered an acceptable medical source under 20 C.F.R. § 404.1513(a), (d);

regulations treat "[p]ublic and private social welfare agency personnel as "other sources," 20

C.F.R. § 404.1513(d)(3)). In any event, Ms. Spence's notation about "likely schizoaffective

symptoms" is not a definitive diagnosis, although it appears to have been carried forward

without further consideration in subsequent records. For example, treating psychiatrist

Dr. Andrich mentioned Schizoaffective Disorder as a diagnosis, Tr. 208, but did so only on the

basis of a "previous diagnosis." *Id.* Examining psychiatrist Dr. Cloak did not diagnose

Schizoaffective Disorder and identified Dissociative Disorder only as a "rule out" diagnosis.

Tr. 245-46. Dr. Brischetto explicitly rejected the diagnosis of Schizoaffective Disorder on the

ground that it was unsupported by Ms. Hall's history or presentation. Tr. 175.

With regard to Ms. Hall's other points, the ALJ did address the severity of Ms. Hall's

impairments. The ALJ analyzed evidence pertaining to Ms. Hall's ADLs, social functioning, and

concentration, persistence and pace, including intellectual functioning and mental status testing.

After considering the evidence in these areas, the ALJ concluded that these impairments were

not severe. Ms. Hall argues that the evidence supports a finding that Ms. Hall's ADLs are

markedly impaired, citing the difference between Dr. Adler's observation in June 2002 that

Ms. Hall was clean and well groomed and Dr. Cloak's observation in October 2005 that Ms. Hall

was living in a tent and presented with dirty hair, fingernails and clothing and body odor.

Ms. Hall also contends that the ALJ's finding of mild limitation in the area of social functioning was erroneous because Ms. Hall's "friends" included homeless, unemployed men, and there was no evidence that Ms. Hall had sustained a relationship with a boyfriend for several years. Moreover, Ms. Hall cites to other evidence of difficulty with interpersonal relationships, including separation from her husband and leaving Oregon in 2007 for Connecticut due to difficulties with her boyfriend and his family.

Ms. Hall also challenges the ALJ's finding that she had only mild limitations of concentration, persistence, or pace, asserting that the medical evidence shows "consistent reporting of Plaintiff's difficulties subduing her multiple personalities." Finally, Ms. Hall argues that her suicide attempt constituted an episode of decompensation lasting almost two weeks and that it could be argued that her entire life had been "a series of connected episodes of decompensation and inability to cope with normal familial relationships." Pl. Mem. at 8.

Ms. Hall's arguments are not persuasive. Under the substantial evidence standard, the Court must uphold the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir. 1996). The Commissioner's findings are upheld if supported by inferences reasonably drawn from the record; if evidence exists to support more than one rational interpretation, the Court must defer to the Commissioner's decision. *Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004). *See also Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (when evidence reasonably supports either confirming or reversing the ALJ's decision, Court may not substitute its judgment for that of ALJ). The ALJ cited Ms. Hall's ability to perform self-care activities, use public transportation, shop and perform household chores, and drive, all as support for the ALJ's conclusion that

Opinion and Order Page 26

Ms. Hall was not severely impaired in her ADLs. The ALJ cited the evidence showing that

Ms. Hall had friends, a history of a stable marriage, and a relationship with a boyfriend for

several years in support of the ALJ's conclusion that Ms. Hall was not severely impaired in her

social functioning. The ALJ noted the absence of clinical evidence that Ms. Hall was impaired in

her ability to attend, concentrate, remember, or persist in a task, and evidence of performing

"fairly well" on mental status testing. And finally, the ALJ found no indication that Ms. Hall had

experienced episodes of decompensation lasting for periods of two weeks or more. Although

there is some record evidence that might support a different conclusion, the ALJ's findings are

supported by substantial evidence in the record as a whole and are free of legal error.

**B.      Reliance on medical expert's testimony**

Ms. Hall next argues that the ALJ erred in relying on Dr. McDevitt's testimony because

Dr. McDevitt's opinions were contrary to all other medical opinions in the record–specifically

those of Doctors Adler, Brischetto and Cloak and practitioners at CCMH and Kaiser. Ms. Hall

further argues that the testimony of Dr. McDevitt, who was only a reviewing physician, was

entitled to less weight than the opinions of the other doctors. Ms. Hall adds that repeated GAF

scores in the 45-47 range by multiple treating sources over a number of years contradict the

opinions of Dr. McDevitt.[7]

Generally, a treating physician's opinion carries more weight than an examining

physician's, and an examining physician's opinion carries more weight than a reviewing

---

[7] Ms. Hall was given a GAF score of 47 by Dr. Adler on June 27, 2002, tr. 161; a GAF of 50-55 by Dr. Andrich on October 3, 2003, tr. 206, 209; a GAF of 47 by Dr. Cloak on October 10, 2005; and a GAF of 45 by Tara Kerner, D.O. when she was admitted to the hospital after the suicide attempt in Connecticut.  Tr. 446.

Opinion and Order Page 27

physician's. *Holohan v. Massinari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. §

404.1527(d). In addition, the regulations give more weight to opinions that are explained than to

those that are not, 20 C.F.R. § 404.1527(d)(3), and to the opinions of specialists concerning

matters relating to their specialty over that of nonspecialists. *Holohan,* 246 F.3d at 1202; 20

C.F.R. § 404.1527(d)(5).

The testimony of a non-examining medical advisor, however, who testifies at the hearing

and is subject to cross examination is entitled to greater weight than the opinions of other non-

treating, non-examining physicians who do not testify and are not subject to cross-examination.

*Andrews*, 53 F.3d at 1042; *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). Further, the ALJ

may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a

treating doctor so long as the ALJ provides "specific and legitimate" reasons supported by

substantial evidence in the record. *Holohan,* 246 F.3d at 1202; *Lester*, 81 F.3d at 830.

The Commissioner persuasively argues that Dr. McDevitt's opinions are not contrary to,

but generally consistent with, those of Doctors Adler, Brischetto, Cloak, and other practitioners

at CCMH and Kaiser. Dr. McDevitt opined that Ms. Hall's impairments seemed to be in

remission with a relatively modest amount of medication. This opinion was consistent with

Ms. Gould's notations in 2003 and 2004 that Ms. Hall was stable on medication (presumably

Zyprexa and Paxil); Ms. Hall's testimony at the hearing that her other personalities had

disappeared after her suicide attempt on October 13, 2007;[8] and Ms. Hall's hearing testimony

that she had not had a "major" seizure since December 2006. There is no evidence from Doctors

---

[8] The record also contains a statement by Ms. Hall in October 2007 to a practitioner at
Hall-Brooke that she had been free of all Dissociative Identity Disorder episodes "for the past 7
years."  Tr. 447.

Adler, Brischetto, or Cloak that contradicts Dr. McDevitt on this point.

Dr. McDevitt testified that, in his opinion, Ms. Hall was not experiencing psychiatric limitations on her capacity to function. This opinion is supported by the ALJ's findings that Ms. Hall's descriptions of her seizures and multiple personalities were inconsistent with one another and conflicted with her reports to practitioners about her daily activities. Dr. McDevitt's opinion is also corroborated by (1) the findings of reviewing psychologist Dr. Henry; (2) Ms. Hall's report to Dr. Adler in 2002 that she spent her days watching television, washing dishes, cleaning, doing laundry, playing on the computer, swimming, playing pool three to four times a week, going shopping, and visiting regularly with  family members and friends; (3) Dr. Adler's normal findings on mental status examination in 2002; (4) Ms. Hall's report to Dr. Cloak in October 2005 that on a typical day, she listened to the radio, played solitaire, visited other campgrounds and friends, read, and visited a skate park; (5) Ms. Hall's statements to Dr. Brischetto in October 2003 that she was "usually pretty good" with people, as well as Dr. Brischetto's observation that Ms. Hall did not appear to be in any emotional distress or appear psychotic or schizophrenic, and seemed capable of understanding information; (6) Dr. Cloak's observation in October 2005 that Ms. Hall did not seem to have depressive symptoms of sufficient duration to meet the criteria for depression, and that she gave no indication of loosening of associations, delusions, intrusive thoughts, or responses to internal stimuli; and (7) Ms. Hall's report she was independent with respect to meals, finances, shopping, transportation and housework; and that she had many friends and a boyfriend. Dr. McDevitt's opinion is also consistent with Dr. Ellison's essentially normal findings on neurological evaluation and Ms. Hall's testimony at the hearing that she was able to remain in internet chat

rooms for as many as four hours a day and to look things up on the internet and do library

research and that she was writing her autobiography and spent one or two hours a day playing

solitaire.

      Dr. McDevitt discounted much of Ms. Hall's self-reporting, as did the ALJ.

Dr. Brischetto also expressed doubts about the validity of Ms. Hall's self reports. Dr. Cloak did

not think Ms. Hall's self-reported symptoms were consistent with depression, and saw no

evidence of delusions or intrusive thoughts. Further, Dr. Cloak, like Dr. McDevitt, considered

Ms. Hall able to understand and remember instructions and sustain short-term concentration and

attention.  Mental health practitioners at CCMH consistently observed that Ms. Hall did not

appear to be responding to internal stimuli.

      While the GAF scores do constitute some evidence that contradicts the opinions of

Dr. McDevitt, GAF scores alone do not establish disability.  A GAF score has been called a

"rough estimate of an individual's psychological, social, and occupational functioning used to

reflect the individual's need for treatment." *Keyser v. Comm'r,* 648 F.3d 721, n. 1 (9th Cir. 2011)

(Graber, J., dissenting), *citing Vargas v. Lambert,* 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998). The

Social Security Administration has rejected the GAF score as a method for evaluating the

severity of impairments because it does not have "a direct correlation to the severity

requirements in the mental disorders listings."  65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000).

The Court concludes that Dr. McDevitt's testimony was sufficiently corroborated by the other

medical practitioners and that the ALJ's acceptance of Dr. McDevitt's testimony was based on

substantial evidence in the record.

///

Opinion and Order Page 30

**C.      Incomplete RFC assessment and hypothetical to VE**

Finally, Ms. Hall argues that the ALJ's failure to consider all of her alleged mental impairments tainted the ALJ's decision at steps three through five. This argument is unpersuasive. As discussed above, the ALJ did not err in finding that Ms. Hall's alleged Schizoaffective Disorder, Dissociative Identity Disorder, and Borderline Personality Disorder were not severe impairments. The ALJ's decision not to include these impairments in the ALJ's analysis after step two was based on substantial evidence in the record.

## V.  CONCLUSION

The Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

Dated this 19th day of September, 2011.


　　　　　　　　　　　　　　　　　　　　 /s/ Michael H. Simon_____
　　　　　　　　　　　　　　　　　　　　Michael H. Simon
　　　　　　　　　　　　　　　　　　　　United States District Judge